**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. __________

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

MICHAEL D. WILLIAMS and
CMI CAPITAL, LLC,

Defendants.
_____________________________________________/

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**
**AND DEMAND FOR JURY TRIAL**

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## I. INTRODUCTION

1. From approximately October 2023 through August 2024 (the "Relevant Period"), Defendants Michael D. Williams ("Williams") and his entity, CMI Capital, LLC d/b/a Check Mate Investments ("CMI") (collectively, "Defendants"), conducted a series of unregistered and fraudulent investment offerings through which they raised approximately $860,000 from at least 18 investors. Several of these investors are current and retired members of law enforcement who trusted Williams because he worked for a police and firefighter pension plan administration company located in West Palm Beach, Florida (the "Pension Company"). He betrayed their trust and misappropriated nearly half of the investor raise.

2. Throughout the Relevant Period, Defendants, acting as unregistered investment advisers, solicited investments in two purported investment funds they managed, CMI Fund 1 and CMI Fund 2 (collectively, the "CMI Funds")—neither of which were ever incorporated. Defendants presented the CMI Funds as successful pooled investment funds which, under their

management, would generate profits for investors by trading in stock options, crypto assets, and S&P 500 equities. Defendants used phone calls, text messages, emails, in-person meetings, social media, and written materials to solicit investors in Southeast Florida and Georgia. Defendants also asked investors to refer friends and family members to invest in the CMI Funds.

3. In soliciting these investments, Defendants deliberately made material misstatements and omissions regarding the performance, safety, and use of funds in the CMI Funds. Defendants held themselves out as accomplished traders with a "proven" strategy, boasted of extraordinary returns, and Williams painted himself as the picture of success—often bragging about purchasing luxury vehicles and high-end watches. In reality, Defendants had no proven trading strategy, and Williams had a personal history of significant trading losses.

4. To attract investors, Defendants created and distributed investor letters, monthly reports, social-media messages, and other written documents containing fabricated returns, fictitious portfolio values, and false claims of past performance. To trick investors, Williams, on behalf of CMI, sent investors screenshots of supposed trading profits that he generated on a practice trading platform and cropped those screenshots to conceal that the trades were not real.

5. Defendants also falsely represented that they would manage the CMI Funds with "little to no risk" using a "proven options strategy" that had purportedly generated year-over-year returns exceeding 187%, including 331% in 2023. In truth, Williams never opened a separate brokerage account for CMI, and CMI's "proven" strategy was based on Williams's own personal trading history in risky options contracts that was marked by years' long losing streaks, including a 65% loss in 2023. Despite knowing that their representations were false, Defendants continued to solicit investments using these fabricated performance claims. Ultimately, Williams's trading

on behalf of the purported CMI Funds in his personal accounts resulted in aggregate trading losses of at least $428,000.

6. While presenting himself and CMI as skilled investment managers, Williams misappropriated large portions of investor and client funds. Williams diverted at least 45% of the total funds raised—at least $383,675.37—to pay his personal credit card balances, his mortgage, and auto expenses, and to purchase vacations, jewelry, and other personal items. Investors, including those in law enforcement, entrusted Defendants with savings intended for retirement, yet Williams used those funds to support his lifestyle.

7. In August 2024, once investors began questioning Williams's claims after realizing he was portraying returns for the CMI Funds from a simulated trading account—not a real one—the façade of profitability quickly crumbled. Defendants attempted to quell rising concerns by offering some repayments to certain investors. To date, Defendants returned at least $375,000 of investor funds to certain investors prior to the Commission's investigation largely using funds provided by Williams's family for the purpose of repaying investors.

8. By engaging in this conduct, Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), (c), and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Defendants also violated Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], by breaching the fiduciary duties they owed to their advisory clients, the CMI Funds.

9. Unless enjoined, Defendants will continue to violate the federal securities laws. The Commission seeks against Defendants permanent injunctive relief and civil penalties and, as

to Williams, a conduct-based injunction, disgorgement of ill-gotten gains, and prejudgment interest thereon.

## II. DEFENDANTS

10. **Williams**, a resident of Port St. Lucie, Florida, operated CMI from an office in West Palm Beach, Florida during the Relevant Period. Williams founded CMI, and as its sole managing member and Chief Executive Officer ("CEO"), he solely manages, owns, and controls the company. In his capacity as sole managing member and CEO, Williams controlled investments purportedly made on behalf of CMI. Williams also controlled investments made on behalf of the purported CMI Funds and, in so doing, acted as the investment adviser to the CMI Funds. Williams has never been registered with the Commission nor held any securities licenses.

11. **CMI** is a Delaware limited liability company formed in January 2024, which does not have a physical office. During the Relevant Period, CMI and its control person, Williams, at times conducted business at the Pension Company's satellite office in West Palm Beach without the consent of the Pension Company's management. During the Relevant Period, CMI, through Williams, acted as an investment adviser managing and raising funds for two purported investment funds, CMI Fund 1 and CMI Fund 2, which CMI and Williams held out to investors as investment funds trading in stock options, crypto assets, and S&P 500 equities. CMI has never been registered with the Commission nor held any securities licenses.

## III. JURISDICTION AND VENUE

12. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)]; and Sections 209(d) and 214(a) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14(a)].

13. This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)] because, among other things, during the time of the violative conduct alleged in the Relevant Period, Williams resided in Port St. Lucie, Florida, and Defendants transacted business or engaged in the violative conduct at issue in this District. In particular, CMI conducted business during the Relevant Period in an office in this District, and Williams conducted, supervised, and managed all aspects of CMI's business from this District. This included meeting with, soliciting, and selling interests in the profits of the CMI Funds to investors and thereafter communicating with those investors, the majority of whom reside in this District, including through email and telephone communications emanating from this District.

14. In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, or the mails.

## IV. DEFENDANTS' ACTS IN VIOLATION OF THE SECURITIES LAWS

### A. Defendants' Unregistered Securities Offerings

15. During the Relevant Period, Defendants offered and sold securities—all in unregistered offerings—in the form of investment contracts to invest in the purported CMI Funds for which they served as investment advisers. Defendants represented to investors and prospective investors of the CMI Funds that their funds would be pooled to buy and sell options contracts, crypto assets, and S&P 500 equities. In return, investors would share in the profits of the CMI Funds, which would be actively managed by Williams in his capacity as CMI's manager. Williams

pooled investor funds in his personal brokerage accounts in which he primarily traded stock options, as well as S&P 500 equities and crypto assets, on behalf of the CMI Funds.

16. During the Relevant Period, Defendants held themselves out to the public as investment managers of the CMI Funds and were, in fact, the sole persons who provided investment advice and made investments on behalf of the purported CMI Funds.

17. Defendants engaged in general solicitation and offered investments in the CMI Funds to prospective investors through several methods, including telephone, text messages, emails, in-person meetings, social media, and written documents such as investment agreements.

18. Defendants solicited investors through a Facebook group in which they gave investment advice for a $100 fee to investors who joined the group, including investors with whom they had no preexisting relationships. Williams, acting as the founder and manager of CMI, also solicited investments from police pensioners and active law enforcement while working as an administrative assistant and pension plan administrator at the Pension Company, which did not participate in the scheme. Unbeknownst to the Pension Company, Williams often used his Pension Company email address when soliciting investments for the CMI Funds and on at least one occasion used the Pension Company's satellite office at the Police Benevolent Association in West Palm Beach to meet with investors. Williams also asked investors to refer friends and family members to invest with whom Williams and CMI had no preexisting relationships. In so doing, Williams and CMI did not take reasonable steps to verify whether the CMI Funds' investors were accredited, and several were, in fact, unaccredited and had no substantial experience investing.

19. Defendants provided investors with written documents, including investment agreements drafted by Williams, describing their investments in the CMI Funds. Williams, acting for CMI, sent the investment agreements for the CMI Funds to prospective investors. These

agreements refer to investing in the CMI Funds as a "personal investment." Williams and CMI represented to investors orally and in writing, and investors understood that signing these investment agreements would allow them to invest in the CMI Funds and share in the profits with other investors who had invested in those funds. Defendants sold interests in the CMI Funds to investors through these investment agreements.

20. During the Relevant Period, Defendants sent to investors and prospective investors several letters and monthly reports drafted by Williams describing the investments. In these letters, Defendants stated that the CMI Funds would adopt CMI's options trading strategy and boasted that: "Over the last 5 years the CMI options strategy has provided year over year performance of 187% with 2023 being 331% returns." Defendants assured investors in the letters that the CMI Funds "will be managed in the same manner of research into stocks with the setups that satisfy all conditions of analysis required." Defendants further represented in these letters that "the Fund[s] will be actively managed daily where trading can be maximined for profitability and with little to no risk being able to sit full cash at the end of everyday as well." Defendants asked the letter recipients to sign investment agreements to become investors in the CMI Funds. In an investor report dated March 1, 2024, Defendants further represented that CMI Fund 1 had "started off in a stellar fashion capitalizing on crypto related stocks and the S&P."

21. Investors completely depended on Defendants to make successful investments to generate investment returns. Defendants exercised exclusive control over investors' funds, including making all investment decisions purportedly generating investor returns. Defendants offered investors passive investments in the CMI Funds by representing that profits would be generated by Williams's efforts to actively manage trading for the CMI Funds on a daily basis.

22. Defendants failed to provide investors with sufficient financial information about the CMI Funds. The monthly reports contained only basic financial information about the CMI Funds, such as their purported current portfolio value and purported profits. None of the materials Williams sent to investors on behalf of CMI contained financial statements for the CMI Funds.

23. The investment agreements for interests in the CMI Funds sold by Defendants are securities within the meaning of the Securities Act, the Exchange Act, and the Advisers Act because they are investment contracts. The investment agreements are investment contracts because: (i) they were sold to investors for money; (ii) investors were dependent upon the expertise or efforts of the Defendants; (iii) investors expected to profit from the investment agreements; and (iv) all investor profits were to be generated by Defendants' efforts.

24. Defendants did not file a registration statement with the Commission pursuant to the Securities Act relating to the investments contracts that Defendants offered and sold through the CMI Funds, and no exemption from registration existed with respect to the CMI Funds.

## B. Defendants Acted as Investment Advisers

25. Through these same letters and monthly reports, Defendants held themselves out as providing and, in fact, did provide, securities investment advice to the CMI Funds. Defendants advised and made investment decisions for the purported CMI Funds by trading securities in the form of stocks and stock options for the CMI Funds and received compensation through misappropriated funds.

26. As the sole owner, principal, and manager of CMI—an unregistered investment adviser—Williams controlled CMI and provided advice to the CMI Funds concerning their investments in stocks and stock options. By advising the CMI Funds as to the value and

advisability of investing in, purchasing, and selling stocks and stock options for compensation, Defendants acted as investment advisers within the meaning of the Advisers Act to the CMI Funds.

### C. Defendants' Materially False and Misleading Statements and Omissions

27. Defendants knowingly made, both orally and in writing, materially false and misleading statements and omissions to investors and their clients, the CMI Funds, concerning the use of investor and client funds and the profitability and safety of investing in the CMI Funds.

#### *(1) Lies and Omissions Concerning the Use of Investor and Client Funds*

28. Defendants misrepresented to investors and their clients, the CMI Funds, in letters they sent to investors in January, April, and May 2024, that investor and client funds would be used to trade options contracts. For example, in one letter sent to an investor dated January 25, 2024, Williams began by "div[ing] into the strategy used for the fund . . . [o]ptions trading." Defendants also represented in an investor report dated March 1, 2024, that funds would be used to trade crypto assets and S&P 500 equities, writing that CMI Fund 1 had "started off in a stellar fashion capitalizing on crypto related stocks and the S&P."

29. These representations concerning the use of investor and client funds were materially misleading because, among other things, Defendants did not use all of the funds as represented. Instead, Williams misappropriated nearly half of the client and investor funds to pay his personal expenses and debts and commingled these funds in his personal brokerage and bank accounts. Defendants never opened any brokerage accounts for the CMI Funds nor did they ever incorporate these purported funds. Instead, investor and client funds flowed from investors to Williams's personal bank account, and in turn, to his personal brokerage accounts.

30. Defendants knew, or were severely reckless in not knowing, that each of these misstatements and omissions were false and misleading because Williams, through his exclusive

control of CMI, was solely responsible for the management of the CMI Funds and controlled all the bank and brokerage accounts from which the CMI Funds' assets were deposited, commingled, and misappropriated.

***(2) <u>Safety of the Investment</u>***

31. Defendants also misrepresented the safety of investing in the CMI Funds in their letters to investors and prospective investors from January, April, and May 2024. In those letters to investors, Defendants represented that "the Fund[s] will be actively managed daily . . . with little to no risk" using a "proven options strategy." In reality, Williams never opened any brokerage accounts for CMI, and Defendants' supposedly "proven" strategy—based entirely on Williams's personal options trading—had actually produced cumulative annual losses every year from 2020 through 2023, including a 65 % loss in 2023, with no trading activity at all in 2018 or 2019. Given Defendants' history of trading losses and representations that Williams would employ options trading strategies for the CMI Funds that he employed for his own personal trading, Defendants knew, or at the very least, were severely reckless in not knowing, that their representation that the CMI options trading strategy would involve "little to no risk" was false. Despite this knowledge, Defendants continued to solicit investments in the CMI Funds by making this false representation regarding the safety of the investment.

***(3) <u>Profitability of the Investment</u>***

32. Throughout the Relevant Period, Defendants attracted investors to invest in the CMI Funds using false promises of the profitability of the CMI Funds and the CMI options trading strategy that was being used for the CMI Funds, each of which they knew, or were severely reckless in not knowing, were materially false and misleading.

33. In investor letters Williams sent in January, April, and May 2024, Defendants represented that CMI's options trading strategy, which would be applied to the CMI Funds, had in the past 5 years "provided year over year performance of 187% with 2023 being 331% returns." In fact, Williams never opened any brokerage accounts for CMI, and Williams's own trading prior to the CMI Funds had resulted in multiple years of losses, as discussed above.

34. Williams, acting for CMI, also knowingly prepared and sent investors and prospective investors fabricated profits and portfolio values for the CMI Funds in the form of monthly reports and posts on social media during the Relevant Period. Williams, acting for CMI, frequently posted highly cropped screenshots of fake returns he had made on a practice trading platform to the Check Mate Investments Facebook group chat, while passing his fake returns off as real trades made for the CMI Funds.

35. For example, on or about April 18, 2024, Williams misrepresented to investors and prospective investors in a Facebook group chat that CMI Fund 1 was $40,000 away from reaching a million-dollar portfolio value while posting GIFs from the movie *The Wolf of Wall Street*, as shown below:



36. In another example, on or about July 31, 2024, Williams wrote in a Facebook group chat with investors and prospective investors entitled "Check Mate Investments," that CMI Fund 1 had "breached the $5 mill[ion] mark," as shown below:




37. Defendants also deliberately misrepresented that CMI Fund 1 had reached a portfolio value of over $5 million in other written documents that Williams sent to investors through text messaging and email. This included representations in a report written by Williams that he provided to investors and dated August 1, 2024, in which he boasted that CMI Fund 1's portfolio value had reached over $5 million and achieved returns of 141.08% since its purported inception in January 2024, as shown below:

CMI Capital

August 1, 2024

*Fund Return Since Inception:

***141.08%***

Portfolio Present Value:

***$5,062,702***

Dear Investor,

CMI Capital Fund 1 is excited to report a return of 141.08% through the month of July. Market overview currently right in line with the current thesis I have been speaking about for little over two months. In the last report I mentioned indicators I was watching for a volatile downside move which we capitalized on greatly. The short positions the Fund had, secured profit of over $528,000!

Furthermore, as mentioned in the last report, the VIX (volatility indicator) began to pick up pace which created the downside move quickly. With the elevated price of VIX currently the outlook for the next few months will be in my opinion, extremely volatile. I do expect a "relief bounce" to occur over the next 1-3 weeks and begin to open short positions for the bigger market downturn. If you have any questions or concerns about other investment holdings you have, please feel free to give me a call at anytime Thank you for your continued commitment as a investor and being part of the CMI Capital family.

Sincerely,

Michael Williams

38. Similarly, in a monthly report provided to investors drafted by Williams for CMI Fund 2 dated August 1, 2024, Williams misrepresented that the fund generated a return of 8.1% in a single month and attained a portfolio value of over $2 million.

39. Neither the returns nor the portfolio values Defendants presented in monthly reports and social media posts were real. Defendants' purported trading strategy for the CMI Funds was unprofitable every month of trading during the Relevant Period. Ultimately, Williams's trading on behalf of the purported CMI Funds resulted in aggregate trading losses of at least $428,000.

Williams's knowledge that the returns and portfolio values were fake is imputed to CMI because Williams was at all relevant times CMI's control person and CEO.

40. Defendants knew, or were severely reckless in not knowing, that each of the representations detailed above was false and misleading. Defendants exercised exclusive control over the management of the CMI Funds, including the selection and disposition of options contract and equity investments and control over the accounts in which investor and client funds associated with the CMI Funds were held. Defendants had exclusive control over the brokerage accounts used to trade on behalf of the CMI Funds. Furthermore, Williams knew he was misappropriating investor and client funds.

**D. <u>Defendants' Fraudulent Scheme</u>**

41. Together with making the misrepresentations above, Defendants engaged in a fraudulent scheme to misappropriate investor and client funds. Defendants also engaged in a scheme to deceive investors, prospective investors, and their clients as to the profitability of the CMI Funds by generating fake trading records on a simulated practice platform, sending investors highly cropped screenshots of these trading records that concealed that the trades were not real, and passing these records off as records of real trades and returns made for the CMI Funds.

***(1) Misappropriation***

42. Of the at least $860,000 invested in the CMI Funds, Williams misappropriated at least $383,675.37—i.e., at least 45% of the total funds raised—for his personal use. For example, Williams used at least $249,000 of investor funds to pay his personal credit cards and loans, including the mortgage on his residence, $41,333.47 in cash withdrawals, and $27,146.10 for auto and transportation related expenses. Williams also used investor funds to fund his personal purchases of a high-end sports car, as well as multiple luxury car rentals, jewelry, luxury goods, lavish international and domestic vacations, restaurants, and treatments at a medical spa.

***(2) Fake Trading Records and Performance***

43. During the Relevant Period, Williams, acting for CMI, frequently posted to the Check Mate Investments Facebook group chat highly cropped screenshots of fake returns he had made on a practice trading platform, while passing his fake returns and trades off as real trades and returns made for the CMI Funds.

44. For example, as shown above in Paragraph 36, Williams sent investors and prospective investors a highly cropped screenshot on or about July 31, 2024, from a trading platform purporting to demonstrate that the CMI Funds had achieved a portfolio value of over $5 million.

45. When investors and prospective investors clicked on the screenshot Williams posted in this chat, they saw the following figure, which Williams generated using a practice trading platform:




46. Williams's acts of generating fake trading records, cropping them in a deceptive manner, and presenting those fabricated records as authentic records for the CMI Funds misled investors and prospective investors into believing Defendants' misrepresentations about the CMI Funds' profitability.

**E. <u>Defendants' Scheme Falls Apart</u>**

47. The scheme unraveled in or around August 2024 after investors became aware that Williams was passing off returns from a simulated trading account as real returns for the CMI Funds. That same month, Defendants returned at least $375,000 of investor funds to certain

investors prior to the Commission's investigation largely using funds provided by Williams's family for the purpose of repaying investors.

## V. CLAIMS FOR RELIEF

### COUNT I

**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Against Both Defendants)**

48. The Commission repeats and realleges Paragraphs 1 through 47 of this Complaint.

49. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued by Defendants as described in this Complaint, and no exemption from registration existed with respect to these securities.

50. From approximately October 2023 until at least August 2024, Defendants, directly and indirectly:

a. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

b. carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

c. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

51. By reason of the foregoing, Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

**Violations of Section 17(a)(1) of the Securities Act**
**(Against Both Defendants)**

52. The Commission repeats and realleges Paragraphs 1 through 47 of this Complaint.

53. During the Relevant Period, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes, or artifices to defraud.

54. By reason of the foregoing, Defendants, directly or indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

**Violations of Section 17(a)(2) of the Securities Act**
**(Against Both Defendants)**

55. The Commission repeats and realleges Paragraphs 1 through 47 of this Complaint.

56. During the Relevant Period, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

57. By reason of the foregoing, Defendants, directly or indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**COUNT IV**

**Violations of Section 17(a)(3) of the Securities Act**
**(Against Both Defendants)**

58. The Commission repeats and realleges Paragraphs 1 through 47 of this Complaint.

59. During the Relevant Period, Defendants, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, and courses of business which have operated as a fraud or deceit upon the purchasers.

60. By reason of the foregoing, Defendants, directly or indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**COUNT V**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)**
**(Against Both Defendants)**

61. The Commission repeats and realleges Paragraphs 1 through 47 of this Complaint.

62. During the Relevant Period, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes, or artifices to defraud in connection with the purchase or sale of securities.

63. By reason of the foregoing, Defendants, directly or indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)] thereunder.

**COUNT VI**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Both Defendants)**

64. The Commission repeats and realleges Paragraphs 1 through 47 of this Complaint.

65. During the Relevant Period, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66. By reason of the foregoing, Defendants, directly or indirectly, violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

**COUNT VII**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c)**
**(Against Both Defendants)**

67. The Commission repeats and realleges Paragraphs 1 through 47 of this Complaint.

68. During the Relevant Period, Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices, and courses of business which have operated as a fraud upon the purchasers of such securities.

69. By reason of the foregoing, Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)] thereunder.

## COUNT VIII

**Violations of Section 206(1) of the Advisers Act**
**(Against Both Defendants)**

70. The Commission repeats and realleges Paragraphs 1 through 47 of this Complaint.

71. During the Relevant Period, Defendants, for compensation, engaged in the business of directly advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. Defendants were therefore "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

72. Defendants, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly or recklessly employed a device, scheme, or artifice to defraud one or more clients or prospective clients.

73. By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT IX

**Violations of Section 206(2) of the Advisers Act**
**(Against Both Defendants)**

74. The Commission repeats and realleges Paragraphs 1 through 47, and Paragraph 71 of this Complaint.

75. During the Relevant Period, Defendants, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, negligently engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon one or more clients or prospective clients.

76. By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

**COUNT X**

**Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8(a)(1)**
**(Against Both Defendants)**

77. The Commission repeats and realleges Paragraphs 1 through 47, and Paragraph 71 of this Complaint.

78. Each of CMI Fund 1 and CMI Fund 2 is a "pooled investment vehicle[]" within the meaning of Rule 206(4)-8(b) of the Advisers Act.

79. During the Relevant Period, Defendants, directly or indirectly, negligently made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in CMI Funds.

80. By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8(a)(1) thereunder [17 C.F.R. 275.206(4)-8(a)(1)].

**COUNT XI**

**Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8(a)(2)**
**(Against Both Defendants)**

81. The Commission repeats and realleges Paragraphs 1 through 47 and Paragraphs 71 and 78 of this Complaint.

82. During the Relevant Period, Defendants, directly or indirectly, negligently engaged in acts, practices, or course of business that were fraudulent, deceptive, or manipulative with respect to investors and/or prospective investors in CMI Funds.

83. By reason of the foregoing, Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8(a)(2) thereunder [17 C.F.R. § 275.206(4)-8(a)(2)].

## VI. RELIEF REQUESTED

The Commission respectfully requests the Court find that Defendants committed the foregoing violations, and:

### A. Permanent Injunction

Issue a permanent injunction enjoining Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them and each of them, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; and further enjoining Defendants from violating Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8(a) thereunder [17 C.F.R. § 275.206(4)-8(a)].

### B. Conduct-Based Injunction

Issue a conduct-based injunction restraining and enjoining Williams from directly or indirectly, including, but not limited to, through any entity owned or controlled by Williams, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Williams from purchasing or selling securities for his own personal account pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

### C. Disgorgement and Prejudgment Interest

Issue an order directing Williams to disgorge all ill-gotten gains or proceeds received, with prejudgment interest thereon, resulting from the acts and/or courses of conduct alleged in this Complaint pursuant to Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (5), and (7)].

### D. Civil Monetary Penalties

Issue an order directing Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### E. Further Relief

Grant such other and further relief that may be necessary and appropriate.

## VII. DEMAND FOR JURY TRIAL

The Commission demands a trial by jury on any and all issues so triable.

Dated: September 23, 2026

Respectfully submitted,

*/s/Michael C. Mikulic*
Michael C. Mikulic, Esq.
Trial Counsel
Florida Bar No. 125073
Direct Dial: (305) 982-6353
Email: mikulicm@sec.gov

Melika Hadziomerovic, Esq.
Senior Counsel
A. No. A5503575
Direct Dial: (305) 416-6277
Email: hadziomerovicm@sec.gov

**ATTORNEYS FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300